**M. R. KOPMEYER COMPANY, Appellant,**

**v.**

**D. Porter BARNES et al., Trading and Doing Business as Beaver Dam Milling Company, Appellees.**

Court of Appeals of Kentucky.

March 4, 1955.

Allen P. Dodd, Jr. (Dodd & Dodd), Louisville, Claude E. Smith, Owensboro, for appellant.

Clarence Bartlett, Walter Catinna, Woodward, Bartlett & Catinna, Hartford, for appellee.

CULLEN, Commissioner.

The M. R. Kopmeyer Company, an advertising agency, brought action against D. Porter Barnes and T. B. Barnes, doing business as the Beaver Dam Milling Company, to recover a sum in the neighborhood of $23,000 alleged to be due as the balance of an account for advertising services and materials which the agency had paid for on behalf of the milling company. The milling company denied liability, and entered a counterclaim for approximately $3,800, claiming that the account had been overpaid. The case was submitted to a jury, which returned a verdict denying the agency any recovery on its claim, and allowing the milling company $2,500 on its counterclaim. The agency appeals from the judgment entered upon the verdict.

The issues all revolve around the basic question of whether, by oral agreement supplementing the original written contract or by subsequent oral agreement, the agency was prohibited from incurring obligations for advertising services in excess of five percent of the monthly gross sales of the milling company.

The business relations between the advertising agency and the milling company began on May 16, 1944, with the execution of a written contract under which the agency was to handle the planning and placement of advertising for the milling company. The contract included the following provisions:

"M. R. Kopmeyer Company agrees to prepare, at its own expense, a definite advertising and sales promotion plan for the above advertiser.

"The advertiser shall have the right to approve, revise, or reject, any part or all of said plan or any other advertising and sales promotion plans submitted by M. R. Kopmeyer Company.

"The advertiser shall pay Only for such advertising and advertising service and materials as said advertiser approves and authorizes."

Under the contract, the advertising agency was to receive a fee of fifteen percent of the total cost of the advertising except where an agency discount was allowed by the magazine, newspaper or radio station with which the advertising was placed.

From the time the contract was entered into, in May 1944, until October or November, 1950, the parties operated under the contract in apparent harmony. The method of operation was as follows: The agency would prepare an advertising schedule or plan, which would be approved by the milling company; the agency then would place "insertion orders" with the magazines, newspapers and other media, calling for the publication of the advertising matter a month or two months after the date of the order; copies of the insertion orders were mailed to the milling company, and it was understood that the milling company had the right to cancel or revoke any or all of the orders before the publication date; the agency would pay for the advertising when published, out of its own funds, and then would bill the milling company, monthly, for the amount due (including the agency fee on any advertising on which a fee was payable).

Although the record is somewhat unsatisfactory on this point, it appears that the advertising costs between May 1944 and

November 1950 sometimes exceeded the claimed limit of five percent of gross sales.

A question concerning the amount of the advertising expenditures was first raised by the milling company by a letter to the advertising agency on October 23, 1950. Notwithstanding the complaint voiced in that letter (which presently will be discussed), the milling company paid in full the advertising bills for November and December, 1950, and for January 1951. Thereafter, from February through June, 1951, the milling company made only partial payments on the bills, and after June 29, 1951, made no further payments.

The advertising costs for the period from February through June, 1951, totalled $30,-588.63, and the payments made by the milling company for the period totalled only $14,619.46, leaving an unpaid balance of approximately $16,000. (Other charges subsequently accruing, for noncancellable advertising previously placed, amounted to $7,906.77, making the total unpaid amount of $23,875.94 for which the advertising agency sued.)

It is clear from the record that the reason the milling company made only partial payments during the period from February to June, 1951, was because the company was in financial difficulty. Several discussions were had between the owners of the milling company and the credit manager of the advertising agency, concerning methods of paying the delinquent amounts, and a schedule of payments was worked out. The milling company was unable to meet the schedule, and tendered a note for one payment, which the advertising agency rejected. In a letter of July 13, 1951, the milling company recognized that the unpaid balance was the sum of approximately $16,-000 above mentioned. At no time did the owners of the milling company refuse to admit liability, or give as a reason for non-payment the fact that the advertising charges were in excess of the contractual limit.

The dispute in this action concerns the advertising costs for the period from November 1950 to June 1951. During this period the total costs were $48,143.09. The amounts paid by the milling company totalled $32,163.92. The milling company now maintains that the costs exceeded the agreed five percent limit by $27,719.65. On this basis, the costs should have been limited to $20,423.44, and the milling company overpaid its account by some $11,800. However, the company concedes liability for the amount of subsequently accruing, noncancellable advertising, $7,906.77, which would make its net overpayment approximately $3,800.

It may be observed that although the milling company now complains that the charges for November and December, 1950, and January 1951, exceeded the five percent limit by more than $10,000, the company paid the bills for these months in regular course. It further may be observed that at no time did the milling company exercise its privilege of cancelling any of the advertising insertion orders. Nor does the company contend that any specific advertising was not approved and authorized by them.

The contention of the milling company, as concerns the alleged five percent limit, is that contemporaneously with the execution of the written contract in May 1944 it was orally agreed that no advertising costs would be incurred in excess of five percent of the monthly gross sales of the company. It is maintained that the written contract was *not complete,* in that it made no provision with respect to the *quantity* of advertising to be done, and therefore evidence of the contemporaneous parol agreement, completing the contract, was competent. This theory of the milling company was set forth in its third amended answer and counterclaim, to which the advertising agency demurred. The agency maintains that the court erred in overruling the demurrer, and in admitting evidence of the parol agreement.

It is well established that where an agreement is reduced to writing in such terms as to express a complete contract, evidence of a contemporaneous oral agreement on the same subject matter, varying,

modifying, contradicting or enlarging the written agreement, is incompetent, in the absence of an allegation of fraud or mistake. Geary-Gay Motor Company v. Chasteen, 248 Ky. 283, 58 S.W.2d 393. Also, there is a presumption that the written contract contains the entire agreement. Ross Seed Co. v. Sturgis Implement & Hardware Co., 297 Ky. 776, 181 S.W.2d 426.

We cannot agree with the contention of the milling company that the written contract of May 1944 was incomplete with respect to the quantity of advertising to be done, nor with the further contention that the contract was lacking in identification of the subject matter. The contract provided for the preparation of plans which must be submitted to the milling company for approval, revision or rejection, and further provided that the company would pay only for such advertising as the company approved and authorized. This established a simple and complete method for determining the quantity of advertising. If the company desired to limit its advertising costs to five percent of its gross sales, all the company need do would be to reject all proposed advertising in excess of that limit. No essential term of the contract was missing. See Brooks v. Smith, Ky., 269 S.W.2d 259.

■ It is our opinion that the alleged oral agreement had the effect of varying, modifying or enlarging a complete written contract, and that evidence of the oral agreement was incompetent. The demurrer to the third amended answer and counterclaim, which set forth the alleged oral agreement, should have been sustained, and the evidence should not have been admitted.

■ Although the milling company did not plead that the original written contract was *subsequently* modified by an oral agreement to limit the advertising expenditures to five percent of gross sales, the case was so developed upon the trial that we think this question requires consideration.

A letter of October 23, 1950, from Mr. D. Porter Barnes of the milling company to Mr. Fred Gerberding of the advertising agency, was in part as follows:

"Dear Fred: I have been checking on our advertising costs compared to our sales. I find that our monthly sales for the year have averaged about $58,000.00

"Advertising costs have been materially over our limit of 5% so I can see nothing but a cut in them."

Mr. Barnes testified that following the writing of this letter he called Mr. Gerberding by telephone and "objected very strenuously" to the amount of the advertising costs, and that Mr. Gerberding suggested that they continue with their scheduled advertising program and said that the attorneys for the agency were going to figure out the agency's excess profits tax which might result in the allowance of a refund to the milling company.

Despite the letter and telephoned protest, the milling company subsequently paid the advertising bills for November and December, 1950, and January 1951, which were more than $10,000 in excess of the claimed five percent limit, and the company did not exercise its privilege to cancel any of the insertion orders.

In April 1951 Mr. Barnes wrote another letter to Mr. Gerberding, as follows:

"Dear Fred:
"I have just received your invoice for March. After looking it over thoroughly I do not believe that you understand that it is necessary to cut our advertising appropriation to 5%.

"I wrote you about this last fall. Also we talked about it early this year on the phone and you indicated that we should continue at the same rate for the time being as you were consulting a lawyer about disposition of excess profits that would help out.

"Our margin of profit will not permit more than 5% and the results obtained

from the larger expenditure do not warrant continuing it.

"Thanking you for your cooperation, we are,

"Yours truly,
"Beaver Dam Milling Co.,
"D. Porter Barnes"

In response to this letter the vice president of the advertising agency wrote to Mr. Barnes, on April 27, 1951, a letter which among other things contained the following:

"If you will remember, you are going to furnish us with a month by month sales figures, broken down by months between flour and feed by territories— the home territory and the Eastern Kentucky territory. We need the figures for 1951 right away as we are in the midst of examining all potential advertising media—whether currently being used or not—to be absolutely certain that the best possible job is being done for every dollar spent.

"In order to actually implement these plans, we want to establish the budget as we discussed with you—know how much money is available in each of the territories—and be doubly sure that the budget is not exceeded for 1951."

On May 2, 1951, Mr. Barnes wrote another letter to the advertising agency, which read, in part:

"I am enclosing a list of our sales for last year and also for the first four months of this year. This is for use in connection with our advertising appropriation and will give your agency something to work on from month to month."

Of some significance is the fact that after this letter of May 2, 1951, the advertising expenditures for June 1951 were limited to an amount less than five percent of the milling company's gross sales for June. However, it is not clear whether the limitation was due to the letter or to the fact that the milling company was then very substantially delinquent in its account with the advertising agency. In any event, the advertising program was cut off entirely at the end of June.

It is our opinion that the only conclusion that can be drawn from the letters and alleged oral conversations is that the milling company desired to *reduce* its advertising appropriation and was endeavoring to convince the advertising agency that from the standpoint of advertising policy the expenditures should be limited to five percent of gross sales; but the agency was urging a continuation of the program as previously planned, *and at no time was an agreement reached* that the five percent limit be imposed.

The fact cannot be escaped that under the original written contract the milling company reserved the absolute right not to pay for any advertising except such as the company approved and authorized, and it is admitted that the company approved and authorized the specific advertising for which the agency seeks payment in this action.

If the milling company desired to reduce its advertising expenditures, it had only to reject and cancel the insertion orders. It retained sole and absolute control over the quantity of advertising. The only excuse offered by Mr. Barnes of the milling company is that he did not know how to compute advertising costs, and could not tell from the insertion orders what the costs would amount to. However, we think that Mr. Barnes could and should have known, from the mere quantity of the advertising called for in the insertion orders, that the costs would be far in excess of his desired five percent limit. The costs for September and October, 1950, of which the milling company does not complain, were in excess of $6,000 each month. The costs for November and December, 1950, and for January, February, March and April, 1951, which the milling company now contends should not have exceeded an average of $2,500 per month, actually exceeded an average of $6,000 per month. We think it is obvious that Mr. Barnes could ascertain, from the mere quantity of advertising cov-

ered by the insertion orders, that the cost for the months in dispute would be as much as it was for September and October, 1950, and that this cost would be more than twice the amount that would be payable under a five percent limit.

We can see no basis upon which the milling company should be relieved of liability for the advertising which it specifically approved and authorized. There is considerable argument, in the briefs, about estoppel, but the fact remains that the milling company was in a position at all times to ascertain what the costs were amounting to, and could at any time cancel or reject any advertising it deemed excessive. There is no competent evidence that the advertising agency ever agreed that it would assume responsibility for limiting the expenditures to five percent of gross sales, or that the agency at any time said or did anything that would lead the milling company to believe that the agency was in fact limiting the expenditures.

There is some argument concerning the alleged agreement of the advertising agency to give the milling company a refund out of the excess profits of the agency. However, we think the evidence concerning this subject shows only that the agency offered to have its attorneys investigate the matter with the view of determining the *possibility* of making a refund, and that the stage of an express agreement to make a refund was never reached. The amount of refund was never discussed.

As the case was developed, the real issues were ones of law and not of fact. It is our opinion that as a matter of law the defense and counterclaim of the milling company were not sustainable, and the court erred in submitting the case to the jury.

In the event of another trial, it is our opinion that the court would be justified in holding the trial without a jury, because of the complicated nature of the case. If the evidence should be the same, the court will direct judgment for the plaintiff.

The judgment is reversed, for proceedings in conformity with this opinion.